Your Honor, this is the first case in the morning, call 208-826-Kinley, the marriage of Preston. On behalf of the Attilaw, Mr. Brian Hurst. On behalf of the Attilaw, Mr. Jeffrey W. Preston. Good morning, Counsel. Good morning. Mr. Hurst. Good morning, Justice Zinov. Good morning. Justice Hutchinson. Good morning. Is the microphone on? I guess it is. All right, yeah. If you can just speak a little louder, please. I will try. Okay. This morning I will be addressing why the trial court's classification of the monies that were paid to Deborah Preston on October 20th or 19th of 2000 as a distribution of her inheritance, as opposed to a disbursement of monies that were being held by the trust, was against the manifest way to the evidence. I will also be addressing why the trial court's award of $40,000 in 503-J fees, $10,000 in 508-A-3 fees, and $3,000 in 508-B fees was an abuse of discretion. Counsel, stopping for a minute on the last point that you made, do we not need a report of proceedings in order to review those last contentions? I don't believe that you do, Your Honor. And why not? Because I think that for the purposes of this court, the question is, is the record sufficient for the court to make a determination? Correct, but then report of proceedings as to what occurred would be part of that record, and we don't have that for those hearings. May I inquire, Judge, are you speaking specifically about the $3,000 and the 508-B fees? And the $10,000 as well. As it relates to the 508-B fees, Judge, the order that was entered by the trial court, I think, provides this court with sufficient information to make a finding that that was an abuse of discretion. The order reflects that the motion for fees was brought orally, and that the evidence regarding the claim fees was also done orally. And because this court can look to local court rules, Lake County Circuit Court rules, which require that all motions be in writing, I think that that's sufficient to demonstrate that the trial court did not follow the rules, and that to constitute the fact that they entertained the oral motion in and of itself constitutes an abuse of discretion. Further, the finding... So you're saying that because there was no written motion prepared? Correct, Your Honor. According to the local rule? Correct. That's the ground on which you want us to vacate that order? That is one of the two grounds which I have, Judge. The second being that the trial court has an obligation to make a determination as to the reasonableness and necessity of the fees. And this court, along with other courts in Illinois, particularly in the Gatone case, has been very specific about the obligation that an attorney seeking fees has to demonstrate the reasonableness and necessity. And so while you do not have a report of proceedings to know whether or not there was testimony regarding the time spent, how much time was spent, how much was billed for that time, and specifically what was done, that's the burden that Mr. Brehm had in presenting that motion. And we know from the order that that was done orally. And the request for the fees was $3,000. That's what was awarded. And in the absence of a motion which one sets forth the basis of the claim and two sets forth the foundation for the fees, it's our submission, Judge, that that constitutes an abuse of discretion. As it relates to the, if I understood correctly, Your Honor's question also relates to the 50883 fees, which was the $10,000 for interim fees for the purposes of this appeal. And while there was not a report of proceedings on that, the pleadings, I think, demonstrate what transpired in that case. And the pleadings, the initial pleading which sought the award of 50883 fees does not specify what was contemplated for the cross appeal and what was delineated for the defense of the appeal. And under the Talty case, there's an obligation to do so. There was a contention that was raised in the response to the motion to reconsider that the underlying motion only related to the defense of the fees. But that was not delineated in the motion either. And it's incumbent upon the party that's seeking the fees to delineate why the fees are going to be incurred and for what. All right, I have one other question just on this issue of fees before we move on to something else. With regard, going back to the $3,000 and your argument with respect to the circuit court rule, isn't the first time you raised this issue of the necessity of the motion being in writing pursuant to local circuit court rule? Wasn't that raised for the first time in your reply brief? And therefore, isn't it forfeited?  The order from the trial court reflects that the objection to the motion not being in writing was made at that point. And if I recall correctly, that was my fourth point of appeal was the 508B fees. And I believe that that was raised in my initial brief. Okay, thank you. Go ahead and move on if you wish to another point. Thank you, Judge. As it relates to the classification of this $181,000, the proceeds from the sale of the Waverly residents that were deposited to the Gerald Nagel estate account, the threshold inquiry for tracing whether those, to determine whether those funds were marital or non-marital, was there commingling? And that was the essence of Judge Waller's ruling was she wrote that when those funds were deposited into the Gerald Nagel estate account, that they were in her words, in effect, commingled. And we submit to you that that was an erroneous finding because pursuant to 508, excuse me, 503B, 503C, excuse me, commingling can only be between marital and non-marital property. And it's uncontested that the proceeds from the sale of the Waverly residents were marital funds. They were deposited into an account that was not either marital funds or non-marital funds. Those funds, that account into which it was deposited, belonged to someone else, the Gerald Nagel estate. Does the fact that ultimately she will get distributions from that fund or that trust, that estate trust, does that have any bearing on whether those funds are hers? I don't believe so because what she had at the time that the funds went into that account is she had a beneficial interest. She was a claimant to those funds. There were four other claimants, her other siblings. And so the beneficial interest I don't think is sufficient to qualify as a property interest for the purposes of making a determination whether it was marital or non-marital. It is our position that the funds became her property only when they were distributed from the estate, when it was fixed and determined what of that money she was entitled to. And those funds came out over time. So our first point is that I don't think we reached the issue as to whether there was commingling or not. Because 503C says that commingled marital and non-marital property shall be treated in the following manner. When marital and non-marital property are commingled by the contributing estate. All right. So in essence what you're saying is the Waverly proceeds went into the Gerald Nagel Trust, an account that did not belong to her and therefore was not her non-marital property. That's correct. So there couldn't be any commingling because it was not her non-marital property. She had no interest in it. Also, weren't the proceeds, as I read the briefs, kept separate from all of their funds? They were segregated for accounting purposes from the time that they went in to the time that they left. And that gives me a segue to the next point. Even if this Court were to determine that there were commingling, the funds are clearly traceable. So on what basis should we reverse the trial court's determination that there should be reimbursement in that case? Because there was reimbursement. The funds were inarguably returned to Deborah, and attached to my appendix at 854 is the letter from David Rubin dated October 19, 2000, which identifies those funds as the proceeds from the sale plus interest.  And the fact that they were returned to Deborah and went into an account that was titled solely in Deborah's name has no bearing on the characterization of those funds as being marital or non-marital. And what the unimpeached evidence shows, what the uncontradicted evidence shows, is that those funds sat in the Smith-Barney account from 2000 through 2004. They were periodically dispersed, transferred to the Harris Bank account, which was the party's joint checking account, which is an account that Mr. Preston testified at trial. He had responsibilities for the day-to-day management of that account. And 100 percent of the funds that were returned to Deborah, representing the proceeds, were then utilized to subsidize the family's living expenses. So the marital estate had been entirely reimbursed and credited and had benefited the use of those funds. Now, there is some issue that she also might have used some of those proceeds for some non-marital issues but would reimburse. Where did she reimburse from? From her non-marital accounts. This account or some other account? When you say this account, you mean this one? The one that she, these, I guess the Smith-Barney account. There was a hundred and, what is it, 90-something? 194,000 roughly. And if she took some money for a non-marital purpose, how did she put money back in if we're coming out of the same account? She reimbursed it from separate accounts, which she inherited from her father, Gerald Nagle. So there were other distributions that were not part of this appeal? Absolutely. The distributions that are the question of this appeal is the $605,000, which was advanced to her for the purchase of Buckley, and the $194,000 that was returned to her. Her total inheritance, which was settled I think by 2006, was approximately $1.8 million before taxes. In addition to what she had already received? Totally already. Now, it is important to note that all of the siblings, the five Nagle siblings, took equally under the estate. And that the $194,000 that was returned to Deborah is money that she received above and beyond her inheritance. So there can be no question, the record is uncontradicted, that that money came out in addition to her inheritance. And the paper trail, from as early as 2000, the letter from Mr. Rubin reads, in the direction to the bank, Please wire transfer the following amount into Debbie Nagle's, Nagle is Ms. Preston's maiden name, account as requested below. The amount represents the sale of her home, plus interest, in which the money was held in the Gerald Nagle Revocable Trust. And the amount that was wired on that day was $194,292.84. And also in the appendix at page 53 is the accountant of that interest. So, this is the characterization of the estate administrators from 2000 for a divorce proceeding that wasn't filed until 2006. So, this clearly, I think, demonstrates the paper trail going back long before the divorce proceedings began. Now, as it relates to my other point of appeal, which we haven't discussed, which is the award of $40,000 to Mr. Brent, I think that, in part, my argument is dependent on this Court's finding on our first point of appeal. If you find that our position is correct, and that this $194,000 was the return of those marital funds and not a distribution of her inheritance, then the marital estate in this case is zero. And it's our suggestion to this Court that where there is no marital estate, and the trial court is obligated to award the non-marital property to the spouse who owns it, that the award of $40,000 in fees under 503J is an impermissible taking of Ms. Preston's non-marital assets. Now. Counsel, I had another question with regard to another point that was raised on the request to admit. Yes, Your Honor. If Mr. Preston was truly unaware of the contract for the purchase of Buckley and the $1,000 check from the joint account, wouldn't it be wrong, or at least inequitable, to not allow him to alter his response to that first request to admit, given the importance of the facts alleged in that request? Well, the question is if he was truly unaware. Okay. How do you address that, then? I think that the way that the Court should address that is that you have to consider the credibility of Mr. Preston as he presented at this trial. And here you have a man who let these admissions lie for a substantial period of time. When he was asked where he lived, he couldn't answer that question. We've got a song and dance about, I consider home to be where the heart is. When he was asked on direct examination by his own attorney, what do you do for a living, he went on for about 15 or 20 minutes until Mr. Brend asked for permission to ask him leading questions, and Judge Waller finally turned to him and said, how do you make money? There was a witness who testified, Ms. Goldstein, who testified in a manner that Randall considered to be adverse to him, and he attempted to intimidate that witness through his facial gestures, and that was observed by the sheriff. Was there testimony that he was present when the contract was signed and the check written? I believe that there was testimony that he was present when the initial contract was signed. I don't recall whether the testimony included the check, but as it relates to this check, we know that that check didn't, that $1,000 was not contributed. How do we know that? Because the documents that were submitted on the request to admit show the distributions of that $605,000, which is uncontested, was the entire purchase price. If that check, the $1,000 check, had been negotiated, you would have seen a different amount. It would have been $604,000. And they produced no evidence at trial that that check was ever negotiated, and even Judge Waller observed that it's a standard practice when offering a real estate contract to tender a check, a small check, and that check is frequently not negotiated. And I think that the record demonstrates that that's what transpired in this case. All right, Counselor, you'll have additional time to respond. Thank you, Judge.  Good morning. Good morning, Your Honors. Jeff Brent here on behalf of Randall Preston. Your Honors, I want to just clarify a couple of things that were just brought up in your questions. One, the money was not segregated, Your Honor. It was all put into one account. In fact, the term used by Mr. Trio was, all the funds were pooled.  They used the term that was a made-up term that, for accounting purposes, they kind of kept track separately. But all the money itself, according to Mr. Trio, was pooled into one account with all the other money of the estate, put together, and then some day, a year and a half later, they decided to distribute money. One clarification. That's okay. If it was earmarked within that account, then why do you say it was commingled? I mean, if it was earmarked, then presumably it had a certain identity, did it not? No. Cash is fungible. Once all that money went into one account, to decide that which part of the money came out versus another part of the money is an impossibility. If you have several million dollars sitting in a bank account, to one day say, well, I think we just pulled out of that $5 million, $184,000, these are the monies that came from Waverly, into that account, commingled with $5 million other dollars, now I can identify it as an impossibility. Number two. The court order as to the fee, just very briefly, because my main issue here is obviously the Buckley property, is the court order that awarded the $10,000 specifically identified that it was awarded under 50883, which points specifically to the statute to defend the appeal. So I just wanted to clarify that in case there were any questions on that. All right. With reference to this account, you even said with all, just in this response, with all of the other estate money, even if Mrs. Preston was the only beneficiary of this estate, and she is not. She is not. This is a revocable trust, the Gerald Nagle revocable trust. How can a revocable trust represent someone else's money when it can be revoked at any time? You're actually making my case that what they're arguing is a legal impossibility, a legal impossibility. We all agree that the money in the estate was not Mrs. Preston's money. If it's not her property, which they state clearly in their brief, top of page 20, the very bottom line of page 25, Mr. Trio testifies, and I'm referring to their brief, on page 22 of their brief, that didn't belong to her, didn't belong to Mrs. Preston. Until distribution. Until distribution. But the house was bought in 1999. So the dollars that bought the Buckley house were not her money. In fact. Well, then her father, her dead father bought the house. No. It was a loan. It's miscellaneous money. There was a clear purpose brief brought here. Mrs. Preston testified that they had, that the house was married. The Waverly house that they owned together was married. They bought it when they got married. They lived in that house for 10 years. It was a marital property. Mr. Mays, my client's, or Mrs. Preston's wife's husband, who's an attorney in this matter, testified that he had received a written authorization from my client, as well as Mrs. Preston, that the funds from the sale of the property from Waverly would go back to the estate. There can be no other purpose, no other purpose for that money to go to the estate except for the purchase of a Buckley. In fact, the judge made those findings. This court, the court, the trial court, Judge Walter, used her discretion, and she made findings I agree with. I just believe she came to the wrong conclusion of the law. And if I may, she stated in her opinion, in paragraph judgment number 17, in that paragraph, that the proceeds from Waverly were used for the purchase of Buckley. So if marital money, admitted marital money was used for the purchase of that property, then that's a marital asset. Buckley is a marital asset. To top all of that off, you have the written authorization that everybody agrees was given by my client to turn the money over to repay the loan, given by the estate. The estate is an independent third party. It's nothing more than like a bank. It lent money. The first money to actually be utilized for the purchase of Buckley was the marital funds. Is it your position now that there was no commingling of marital or non-marital property? Is that your position? It was not a commingling in the sense that that money was not non-marital funds. In other words, if that money is not non-marital, if it's not Mrs. Preston's property, it can't be non-marital funds. And thus, the money that was used to purchase Buckley can't be a non-marital asset because not non-marital money was used to purchase it. A double negative has become more difficult here. In other words, you're agreeing there was no commingling. There was no commingling of that money. It was a payback of a loan to purchase the house, which is what the judge found. It's what Ed Trio, who was the lawyer of the estate, testified to and put in his letter five years later in an explanation to Ms. Heather, Mrs. Preston's sister. He said, well, we got the money. We didn't know if this was to be treated as a loan. All implications, the Schmidt case, the Hagey case, these are second district cases. Schmidt just came down last year by the second district. Hagey, 1997. I could analogize to Hagey very easily. Hagey was the case where there were mortgages. There was a house, clearly non-marital house, sold, used as a down payment on another house, put in that same person's name. That property was then, a mortgage was taken on it, in the same person's name. But marital funds were used to pay the mortgage. The court, this court, the second district, found that property to be a marital asset because the mortgage was paid with marital funds. Schmidt, last year, same thing. Clear and convincing evidence needs to be shown to overcome the burden of marital property. Judge Waller never made that distinction here. Judge Waller never stated by clear and convincing evidence that the burden has been overcome. And just as important, in Hagey, in Schmidt, the court stated, the second district stated, that if there are any doubts about a property, it must be found marital. Doubts? There are so many doubts here. The contract was signed by my client and Mrs. Preston to purchase the house. They looked for a house together. They searched for a house together. They went to the broker's office together, signed the contract together. While Mr. Preston and Mrs. Preston were sitting there together, they wrote a check from a joint account, a $1,000 check from a joint account. As they sat there, and used that as the initial earnest money on the contract. The contract even had modifications made to it, issued by both parties. Do we have any evidence that the $1,000 was ever, I mean, we got a check, or everybody recalls a check, or at least your client does. Was it ever cashed? We have the check. That was brought to the court. We don't know whether it was cashed because we don't have the back of the check. Part of the issue of the request to admit was three days before trial. We had issued a subpoena sometime before to all the lawyers, title companies, about finding the documents. Everybody responded back, we don't have them. We became almost desperate. We're calling them, can you please look, check your storage, do anything. Three days before we get a letter from the Tinkoff firm saying we found the file in storage. Great, send me it. What's in there? The real estate contract. We have a copy of a check, only the front of a $1,000 check. It certainly, as Mr. Hurst stated, wouldn't lower the purchase price just because you have an earnest money check. That would have no effect on earnest money. We have so many factors to show this to be real. Do you have any bank records that show that this check was cashed? Banks only keep records for seven years, Your Honor. And as such, going back over ten years ago, back to 1999, those records no longer exist because we did subpoena to see if anybody had that. They don't. They only keep records. Banks are only required to keep records for seven years. So that record doesn't exist. Anybody in the family balance the checkbook so that they could see it was cashed? Well, we made requests of Mrs. who kept the record. She said she cleared out her attic, if you remember the testimony here, and that all of those documents were destroyed and thrown away by her during the trial. Not during the trial. During the proceedings of the case after it was filed that she threw all those documents away. What's also just as important, there was never a waiver by my client of his marital rights here. You must have a written waiver of my client's rights for him to waive his rights to a marital piece of property. We have lawyers everywhere here. Nobody asked him. Okay. But in this first response to admit, Mr. Preston admitted that Buckley was acquired in exchange for money that Mrs. Preston acquired by inheritance, her money by inheritance. And why doesn't that admission really summarily resolve the issue of whether Buckley was marital or non-marital? Two. One, you can never admit a legal conclusion. The legal conclusion there would be that it was an inheritance by their own admission in their briefs. It wasn't an inheritance that she bought the property with. They say she didn't have the money. It wasn't acquired until a distribution on January 20, 2006 that the distribution occurred. That is almost seven years later, and she actually receives her non-marital property. So you can't have an admission of a legal conclusion, and that calls for a legal conclusion. Two, if you look at what he admitted to, that the purchase price of Buckley was $605,000. That's a fact. It's not a legal conclusion. That is a fact. All right? That the purchase were derived from distributions from the estate of Gerald Nagel. We agree with that. But those are not non-marital properties. Those distributions, the money used from the estate by everybody's agreement, was not her non-marital property. Therefore, if it's not her non-marital property, she can't say, I used. Remember, it's got to be acquired by one of the elements under 503, the exceptions. If it's not a non-marital asset, then the purchase could not have been made with non-marital funds and fall within the exceptions. We all agree with that. How is it not her funds again? Because they agreed that it is not her property until it was distributed on January 20, 2006. Mr. Trio testified to that. They, on page 20, I will read. I have it right here. This is from their brief. Because the funds in the Gerald Nagel estate belong to the estate, these funds were not Deborah's non-marital property nor even Deborah's property. It wasn't her money that was used to make the purchase. That's their statement, page 20, second sentence. The next sentence, the third sentence of their brief on page 20, it goes on to say Deborah had no property interest in the funds in the Gerald Nagel estate. Well, you have to look at the section that it's under. I mean, they're not talking about the $605,000, as I see it there. They're talking about other amounts of money, the entire pot, let's call it that. That pot. They did not pay that $605,000 to Deborah Preston. That became her money. No. Why not? No, because it wasn't her money until there's an actual distribution of the estate. Mr. Trio, the estate is an independent entity. This is why not. The estate is an independent entity. It follows its own tax returns. It has to wait for IRS claims to come through, third-party claims to come through, until all those claims are decided. Nobody knows whose money it is, how much it is, who's to be distributed, and how much is to be distributed. So at that point in time, that's why they, Mrs. Preston and her counsel, have put in here that it's not her property. It's owned by the universe. It's owned by a third-party entity. That's a better way to phrase it. Well, then we don't have any issue here. We can just go home because the Gerald Nagel Trust owned that property and ultimately gave it to Mrs. Preston. It didn't own the property. The property was entitled in one of the party's names. Title is irrelevant. All it did was give a loan for the money, which was repaid back by, and this is important, Judge Waller found. Her words, her words. The court concludes that the payment of the Waverly proceeds over to the Gerald Nagel Estate went to partially reimburse Mrs. Preston for supplying the funds to purchase, to purchase 157 Buckley. This is the judge's finding, paragraph 17, where she says the money from Waverly was used to purchase Buckley. Not only was it used to purchase Buckley, it is the first funds either of the parties owned because Mrs. Preston does not own that money that's in the estate. By their agreement, by my agreement, she doesn't own that money. What documentation exists to establish that this transaction you're characterizing as a loan was in fact a loan? Are there any supporting documents that would establish that? Ed Trio's letter, and Mr. Trio is probably better just to be clear about his full name. Mr. Trio's letter says when we received the funds, we didn't know whether to treat this or a loan or not. And that if it is a loan, when it was repaid, that this would be treated as a repayment of the loan is what he states years later when he's writing a letter to Mrs. Preston's sister. That we would be treating it as a loan, that it would be a repayment of the loan. And now the final payment on the loan comes when she receives a distribution in 2006. Now that's her contribution. You're saying somebody's subjective interpretation makes it a loan. There's nothing from the trust itself or any other documentation that would indicate it's considered to be a loan, is there? To the best of my knowledge, there is no loan document. No, sir. But we do have the document that Mr. Mays testifies that he received a written letter of direction from both my client and Mrs. Preston to put the money, to direct him to have the funds paid directly from the closing to the estate. There would be no other reason that my client, who would have a marital interest, this was clearly marital money, it's stipulated marital money, would direct the money to go to the estate except for the purchase of the house that he thinks he has an interest in. Otherwise, if they wanted to keep this separate, what they should have done, or what they could have done, is gone to my client and said, we'd like you to sign a waiver. Mrs. Preston's sister is a lawyer at a high-powered firm. Mr. Mays is a lawyer at a high-powered firm. Mr. Trio's a lawyer. All these documents, buys, sells, all of the closing documents, nobody goes to my client and says, will you please waive your marital rights to that property? He never does that. In fact, he directs it to go there. And do they ask for the check to be put into a separate account? Or do they direct the check to go into both the client's names, the party's names? No, that is segregated, the funds. But what other intent would there be for my client to say, give the money to the estate? There can be no other purpose but to go towards a purchase. And how do we know this? Because that's exactly what Mrs. Preston testified to happened six months earlier when they went to buy a house. And she admits they were looking for a house, they were going to sell Waverly, and that money was going to be used for the purchase of that house. It was going to be joint property. She admits that was going to be marital property. Her prior actions just six months before that, her actions say that's exactly what she intended that property to be. I have one more. Okay. I'm looking at the letter you're referencing, and it has many questions in there. But the one you're talking about starts on 839. And this is Mr. Trio's letter to Deborah or Donna Peck. After the decision was made to treat the advance as a trust distribution, because there's a question about equalization of the siblings here, as a trust distribution, and there's some parentheses, it was clear that the sales proceeds and interest earned on those proceeds were not part of the Gerald Nagel Trust and should be maintained separately from it. For internal accounting purposes, the fund was referred to as Debbie's Grantor Trust. The $12,933.78 represents the earnings that were allocated to the sale proceeds, and this was detailed in another document. How can that be any clearer? Because he also states in another sentence. No, the sentence before. This is the sentence after it. Right. He's clarifying it. He's clarifying it 18 months later in a letter to which nobody can, you are not, to look at the time with hindsight what was in their minds then, or to look at what was going on at the time. And if Mr. Trio, the executor of the estate, couldn't determine at the time, even at the time, saying at the time that this transaction took place, I don't know if it was a loan. I don't know if we're going to treat this as a trust distribution. This court must always err according to the dictates of Schmidt and Hagee, that if there are any doubts, and if Mr. Trio had doubts as to its characterization, and his partners, who were part of the real estate transactions, are working with him, he has doubts about what its character was at the time of the transaction, then this court must find, because you have to look at that moment in time. And he states very clearly, he didn't know what it was to be at that point in time, that it must be marital, because those doubts exist at that time. I thought the issues of whether things are marital, non-marital, price, value, are all at the time of the divorce, which is about this time. No, that letter is 18 months later. If we look at the time here, that letter is October 2000. That house was bought in April of 1999. When did the parties file for divorce, or when was this? It was 1998, I believe, is the time they filed for divorce. I think it might have been July 31, but I'd be guessing. I apologize for that, Your Honor. But it was not until 18 months later that that letter was written. Him stating in that letter, at the time that this transaction occurred, I didn't know what it was. Thank you, counsel. Thank you for your time. Let me address the court. Mr. Hurst. Correcting one of Mr. Brenson's statements. It was 2006, Judge, that the divorce was filed. That's 2006, not 1999. That is correct. Did they have on and off periods where they filed? No. Okay. There were no other filings. And I think that the point that Your Honor makes is a well-settled point of Illinois law under the Kuczynski case. There is no determination made as to marital or non-marital property until the judgment is entered. So this letter is in 2000? 2005. October 19, 2005. That is correct. And there is correspondence that supports this and the position dating back to the time that the estate received those funds. And so Mr. Bren makes an argument to you that because money is fungible that we can't do a tracing. What he is suggesting is that unless you can identify with specificity that the dollar that went into this account is the same as the dollar that comes out of this account, same serial numbers and the like, then it's no good. Well, that's why I called it a pot of money. I just don't visualize a $13 million pot of money sitting somewhere. It came in as a check. It went out as a check. I couldn't agree with you more. When I receive payment from my services, I don't care what the source of the funds is. As long as it's negotiable currency, that's what we're talking about. Did the estate receive the benefit of what it was entitled to, which was the marital property, which was the proceeds of Waverly sale? And it absolutely did. Mr. Hirst, can you offer an explanation as to why Mr. Preston would have agreed to deposit the proceeds from Waverly into the trust? Well, if I did judge, it would be speculation on my part. I don't know. I think what is clear, and Mr. Brenner argues, that it could be that at the time that the $605,000 was advanced, that there was a question, which there was, as to whether it was going to be a loan against her share of the estate or perhaps other assets or an advance on her eventual share of the estate. And under either analysis, you get the same result, which is that it's not a marital, because even if it was a loan, as Mr. Brenner suggested, which I think the documentary evidence shows you that it was not, it was absolutely treated as a distribution. But even if it was a loan, that loan was repaid with monies that she received from her estate, absolutely not the monies that were from the Waverly proceeds that went into it. In their brief, they criticized the segregation that took place. And these funds were segregated from the moment that they hit that account. It's not that they became segregated when this letter was written in 2005 or that they were segregated when the distribution was made in 2000. But from the time that they were deposited, the evidence shows that the documents that were admitted into evidence at trial show that those were marked separately. And so we have this discussion, which to me is ineligible to the fungibility issue, is was this segregation sufficient? Now we have an issue of something that you said in your brief on page 20, where we're talking about the issue of commingling. Does the – and it's – if you read the statement correctly, does that statement stand for the proposition – well, what does that statement stand for the proposition of? That's a dangling participle, pardon me. I understand your question. I understand your honors questions to Mr. Brent really anticipate that answer. The point I was making is while those funds were contained within the estate, they did not belong to Deborah. And I later in that same heading go on to explain that it is only when she receives the distribution, when she gets the cash in her hand and it's under her control, that then it's her money. And so for him to stand here – they made that same argument in the brief. I addressed it in my reply brief. It's just it's a misreading. It's a picking and choosing of the statement that I made. Because the point then, if there's any doubt in the court's mind, the point I was making is that while those monies were in the estate, they were not hers. And the testimony was that she had no right to exercise control over those. She couldn't get those monies unless the estate approved it and gave her those monies. She couldn't direct anyone to do anything. And they were not hers. They were not under her possession. They were not under her control. And when they left, they went and purchased this house. And so then we get into this discussion. You read from paragraph 17 of Judge Waller's decision. Judge Waller does not say that those monies went to repay that amount. She talks about that they were contributed towards that for the monies that she advanced. But there's no question that 100 percent of the purchase price, no mortgage. And the fact that there's no mortgage is significant. Mr. Byrne directs you to Peggy and some of these other cases. In those cases, there was a contribution of non-marital property. If I could finish my point. And then there was payment of mortgages with marital funds over a period of years. And in all of those cases, there was a loss of identity of those funds. And that's why. And it's a two-step process. Commingling, loss of identity leads to transmutation. When does transmutation become marital? Presumably marital. Here, absolutely no loss of identity because this court, as well as Judge Waller, had the ability to find and to trace where these monies came from, how these monies were disposed of, and where they went.  And she was told that the monies that were received were a distribution. What she received in 2000 were a distribution of her estate, not a disbursement of monies that were on deposit. Okay. Thank you very much, counsel. Thank you, Your Honor. Court will take the matter under advisement and render a decision in due course. Court stands in recess. Thank you.